HOLLOWAY CONSTRUCTION CO v STATE OF MICHIGAN

1. CONTRACTS—CONSTRUCTION—FAILURE TO DISCLOSE INFORMATION—
   NEW CONTRACT.

   The failure of the state to disclose certain information not availa-
   ble to the contractor, but which the state knew and deliberately
   and wilfully withheld, before accepting a bid on a highway
   construction contract, resulting in extra costs to the contractor,
   leads to a finding of a clear breach of the contract and subjects
   the state to a liability for all of the damages flowing from such
   breach which were the natural and proximate consequence of
   the breach.

2. OFFICERS—PAYMENTS—PRESUMPTIONS.

   Payments by authorized government officials are presumed to be
   correct, where fraud is neither charged nor proven and no
   mistake is shown.

3. CONTRACTS—PRACTICAL INTERPRETATION—PARTIES.

   A practical interpretation of the provisions of a contract given by
   the parties to that contract is entitled to consideration by the
   court.

4. EVIDENCE—ADMISSION—CONTRADICTION—PERSUASIVENESS.

   An admission is conclusive unless it is varied or contradicted by
   other evidence, and an admission of liability which is not
   satisfactorily explained or contradicted during the trial is per-
   suasive evidence to support the position of the other party in
   accord with such admission or statement.

5. CONTRACTS—BREACH—LIQUIDATED DAMAGES.

   The practical values in the form of liquidated compensation set
   by defendants for an acknowledged partial breach of contract
   should be allowed to stand, where the plaintiff was entitled at

REFERENCES FOR POINTS IN HEADNOTES
[1, 3, 5] 13 Am Jur 2d, Building and Loan Associations §§ 30, 31.
[2] 54 Am Jur, United States § 139.
[4] 30 Am Jur 2d, Evidence § 1082.
[6, 7] 39 Am Jur 2d, Highways, Streets, and Bridges § 92.

the very least to nominal damages and it would be difficult to reach a judicial determination of the damages.

6. HIGHWAYS—HIGHWAY COMMISSIONER—AUTHORITY—EXTRA WORK.

A highway construction contract which gives the highway commissioner the authority to order and pay for extra work and the authority to decide questions of interpretation of the plans and specifications, necessarily includes the authority to decide what is extra work.

7. HIGHWAYS — CONSTRUCTION — EXTRA WORK — PAYMENT — GOVERNMENT OFFICIALS.

Payments made by highway department officials for extra work done under a highway construction contract amount to an admission as to the state's liability for the extra work because of the presumption of correctness under which government officials act.

Appeal from Court of Claims, Richard E. Robinson, J. Submitted Division 2 May 11, 1972, at Lansing. (Docket No. 10248.) Decided February 20, 1973. Leave to appeal denied, 390 Mich —.

Complaint by Holloway Construction Company against the State of Michigan and the State Highway Commissioner for extra work under a construction contract. Counterclaim by defendant. Judgment for defendant in part. Plaintiff and defendant appeal. Affirmed in part, reversed in part, and remanded to the Court of Claims.

*Dykema, Gossett, Spencer, Goodnow & Trigg* (by *Thomas L. Munson* and *Sidney L. Frank)* and *Meisner & Meisner,* for plaintiff.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Louis J. Caruso, Karl S. Vasiloff, Thomas J. Giachino,* and *James D. Mueller,* Assistants Attorney General, for defendant.

Before: J. H. Gillis, P. J., and T. M. Burns and Targonski,* JJ.

Targonski, J. We have here an appeal from the Court of Claims which denied plaintiff's claim in the amount of $1,250,000 for "extra work" beyond the contract bid price of $3,676,378.38 under a highway construction contract and the further appeal from the finding of the Court of Claims allowing counterclaim I lodged by the defendants against the plaintiff. We also have a cross-appeal from the findings of the Court of Claims denying counterclaims II through VII which defendants had filed against the plaintiff.

On the first issue, the matter of the claim filed by the plaintiff, the parties stipulated and the court concurred that the issue would be limited to a question of liability and if there was a determination of liability the item of damages would be considered in a separate trial. The trial court never reached this issue as it made a finding of no liability from which an appeal has been taken. The record below and the briefs submitted are, however, replete with items concerning damages and litigation of damages. We limit our consideration, however, only to the item of liability as stipulated by the parties and ordered by the trial court.

On June 1, 1960, plaintiff entered into a written contract with defendant to construct for the defendant 7.873 miles of Interstate Highway 94 in Berrien County, being one of the final sections necessary to complete I-94 as a continuous limited-access span across the state from its east to its west boundary. The contract, among other things,

---

* Former circuit judge, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

provided for four borrow pits, numbered 1 thru 4, from which part of the earth for the construction of the right-of-way, ramps, and service roads would be obtained. The remainder of the earth for these purposes was to be obtained by cutting and filling operations within the right-of-way. One of the other provisions of the contract was to the effect that plaintiff would be paid for earth excavation at the rate of $.29 per cubic yard, and for overhaul (the cost to transport earth beyond 1,000 feet) at $.05 per compensated cubic-yard mile.

The bid proposal indicated that a portion of the right-of-way, numbered parcel 437, and an easement for a service road, numbered parcel 437E, had been secured prior to the signing of the contract. This was a representation made by the defendant and plaintiff relied on the representation in preparing its bid. The plans indicated that borrow pit number 4 was available at the time the contract was signed. This likewise was a representation made by the defendant and plaintiff relied on the same in the preparation of its bid which formed the basis for the contract between the parties.

Although bids were let on April 27, 1960, the contract was not signed until June 1, 1960. Rough grading under the contract was to commence not later than August 1, 1960, and to be completed not later than December 10, 1960. The parties agree that rough grading was, in fact, commenced June 7, 1960, and completed in early May, 1961.

Plaintiff alleges that contrary to the representations made in the bid proposal upon which plaintiff relied, the defendants did not have the sections of right-of-way nor borrow pit number 4 available at the time the proposals were made nor even at the time the contract between the parties was

signed. Defendants concede the accuracy of these representations by the plaintiff. Plaintiff further claims that because of defendant's failure to make available borrow pit number 4, it was forced to use other borrow pits, numbers 6, 7, 8, 11, and 3A, which were obtained after construction started, and recourse to which, together with the delay in securing them, increased plaintiff's cost over the contract price by $1,250,000. Plaintiff's action was for this amount.

Defendant, on the other hand, claims that plaintiff's increased cost, if any, was not due to the unavailability of borrow pit number 4 and the delay in securing replacement borrow pits, but was rather due to the plaintiff's diverting men and equipment to other jobs, and providing insufficient men and equipment and inadequate equipment for this job, and to plaintiff's inability to cope with the problem of operating in dune sand.

It is interesting to note that borrow pit number 4 was never secured. Borrow pit number 3 was never used and, in fact, was released to its owner on January 20, 1961. The release of borrow pit number 3 to its owners was part of a package deal whereby defendants secured parcels number 437 and 437E for the right-of-way on January 20, 1961, together with borrow pit number 3A. There is no dispute between the parties that the intent in acquiring borrow pit number 3A was to provide from one location all of the earth borrow which the plans contemplated would have come from borrow pits number 3 and 4. Borrow pit 3A provided approximately 299,000 cubic yards of earth for rough grading which under the terms of the contract between the parties was to have been completed upwards of one month prior to the time that borrow pit 3A was acquired. Despite all of

this, the biweekly progress reports prepared by the state engineers which were admitted as one of the almost 100 exhibits in the trial showed plaintiffs on schedule as of January 13, 1961. The delays apparently stemmed from unanticipated weather conditions which created problems with respect to the use of borrow pit 3A after that date.

Borrow pit number 3A was located 4,000 feet west of the right-of-way station at a point referred to on the plans as Station 849. It had no existing haul road and the plaintiff built one to it. This pit contained a minimum of one million cubic yards of dune sand. Plaintiff commenced hauling out of pit 3A in early February, 1961, and by the last week of that month had removed approximately 240,000 cubic yards of earth, at which time an early thaw and rains made the haul road impassable and operations out of that pit ceased temporarily on February 23, 1961. These facts with reference to this borrow pit are not disputed by the parties. After this shutdown, substitute borrow pits farther removed were secured and used. Certain other borrow pits were owned by the defendant at the time the contract was signed. These together with those subsequently acquired were used when attempts to secure pit number 4 were abandoned. Pit number 4 was adjacent to the right-of-way.

Plaintiff originally commenced operations at the north end of the project as contemplated. When pit number 4 was not available, defendant asked plaintiff to move its operations to the south end of the project while attempts to secure pit number 4 continued. Plaintiff contends that this seriously impaired its multiple-operation concept and destroyed flexibility, both of which were important in plaintiff's capacity to meet the deadlines set in the contract and to operate within the framework of the bid proposal.

The trial court found that there were 500,000 cubic yards of material available from pit number 4, that being the estimate of the amount of material as presented in the bid proposal. The proofs, however, do not justify the conclusion by the trial court that this was the upper limit of the material available from pit number 4. In fact, the defendant's witnesses established that there were 700,000 cubic yards or more of the material available from that pit. In fact, there was some testimony to the effect that with certain types of operation it may have been conceivable to secure even upwards of 800,000 cubic yards from that pit.

The complaint in this case was filed July 10, 1963. The record in this case contains more than 80 calendar entries, approximately 100 exhibits with 10 volumes of transcript covering 12 trial days and over 7 years of litigation before 2 Court of Claims judges. Moreover, the appeal in the principal case and that for the counterclaims is set out in 5 volumes of briefs totaling in excess of 238 pages raising 17 claims of error. For purposes of handling such a vast mountain of material, we will consider it in three sections. First, we will consider the plaintiff's appeal from the finding of no liability on the original complaint. Secondly, we will study the appeal from a finding adverse to the plaintiff on defendant's counterclaim I. Lastly, we will consider the defendant's cross-appeal from the dismissal of counterclaims II thru VII.

Our first consideration here is the question of the defendant's liability on the plaintiff's original complaint. All of the parties and the Court of Claims were in agreement that the defendant highway department did not have the right of entry nor ownership of parcels 437 and 437E which constituted part of the right-of-way and a

portion of the service road at an interchange. It is also agreed by all concerned that the highway department at the time of the signing of the contract did not have the right of access to borrow pit number 4. The highway department knew these things at the time that their bid proposal was submitted and the contracts signed by the parties. However, this shortcoming as to right-of-way and borrow pit was not disclosed to the plaintiff until it had its men and equipment out in the field and had started operations at the north end of the project as contemplated by the agreement between the parties. We will first consider the authorities which have been cited by the plaintiff as controlling of the fact situation in this cause.

The first such authority is *Hersey Gravel Co v State Highway Department,* 305 Mich 333 (1943). In that case, the plaintiff obtained plans and specifications from the highway department in connection with an advertisement for bids for the construction of 5.17 miles of highway on US-41 and M-28 in Baraga County. The blueprints which he examined contained notations of soil conditions upon which plaintiff claimed his company placed its bid. Plaintiff claimed that if the material encountered had been of the character indicated by the drawings, the company would have been able to complete the work at the contract price and would have made a reasonable profit. The material encountered, however, according to plaintiff, was not the kind indicated in the drawings and directly and impliedly represented to be, but of a kind vastly more difficult and more expensive to move so that the cost of completing the work of the contract was $59,622.27 in excess of the cost anticipated. The state had taken test borings in the area of the contract and plaintiff claimed that

the soil conditions were of a different character from those indicated on the plans. The state maintained that the material encountered in that case was not more difficult and expensive to handle than that described in the plans, and further that despite the notations on the plans, the contractor should have been aware of the difficult and rocky nature of the terrain because of the outcroppings of ledge rock and boulder formation readily discernible to a prospective bidder. The state admitted that the work had progressed slowly but charged that this was due to dilatory methods employed by the contractor and its lack of good enough equipment. Further, the state claimed that if the contractor's representative had made the proper kind of investigation, the exact nature of the soil could have been ascertained and its bid made accordingly.

The trial judge in *Hersey, supra,* held that the contractor was entitled to rely upon the contract, blueprints, plans, and specifications prepared by the state and upon the engineering practice in that connection. He further stated it was the duty of public authorities, when preparing proposals, to provide all available information and data in unmistakable and clear-cut terms. The trial judge absolved the highway department of any bad faith but held that so far as the excavations along the length of the highway were concerned there was a warranty in connection with the nature of the subsoil and that this warranty had been breached because of a misstatement of the conditions actually existing. The state claimed that the notations on the plans were for information only and did not relieve the bidder of its responsibility to satisfy itself by examining the site of the proposed work as to the actual soil conditions. In that case, the

contractor also cross-appealed from the trial court's refusal to allow its claim in connection with material excavated from borrow pits. The state argued that plaintiff's acceptance of payment of the contract price was approval of the final estimate of extras, and acceptance of payment therefor constituted a waiver and barred further recovery. The findings of the trial court were affirmed to the end that the bidder could rely on the state's representations and that the state had an obligation to make full disclosure of its findings with respect to soil conditions where tests had been made.

The second case cited as authority on the issue is *W H Knapp Co v State Highway Department,* 311 Mich 186 (1945). That case involved a construction contract for 7.532 miles of highway grading and drainage structures in Chippewa and Mackinac Counties. The state had made an examination and survey of the route of the proposed highway. This information was in the office of the State Highway Commissioner but was not shown to the contractor nor set forth in full detail in the specifications. The Court stated, p 199, "[w]e can heartily commend the engineers for their willingness to make a good bargain for the state, but their duty called upon them to set forth in the specifications, descriptive language which would not mislead a bidder. * * * [P]laintiff company was misled by the specifications".

The third case cited is *Valentini v City of Adrian,* 347 Mich 530 (1956). In that case a sewer contractor brought suit against the defendant city for damages claimed to have been caused by the excessive cost of constructing a sewer for the city on account of the city misrepresenting the character of subsoil conditions, known to the defendant

city; namely, quicksand and excessive water. This resulted in a low construction bid and the project was delayed because of unexpected subsoil conditions which greatly increased the cost of constructing this sewer. The Court in affirming the verdict quoted favorably from the opinion of the trial court in *Knapp* as follows:

" 'The court concludes that the State highway department had information at hand relative to the nature and composition of the subsoil which it had neglected to furnish the bidders upon this project; and that the information supplied was of such a nature that only a highly trained expert in soil engineering would have placed the interpretation thereon that defendant claimed it was entitled to. The court finds it was a clear legal duty of the department to furnish all available information on this subject in a form and in a manner that would apprise the prospective bidders of the nature of the difficulties to be encountered and in terms that would be readily understood by the average * * * contractor. Under the record I find that it has not done this and that claimant is entitled to an award of damages.' " *Valentini, supra,* at 539–540.

*Pat J Murphy, Inc v Drummond Dolomite, Inc,* 232 F Supp 509 (ED Wis, 1964), was an action for damages for loss sustained in construction of a road and involved an interpretation of Michigan law. From its exploration for further dolomite deposits on the island, the owner granted information as to the nature of the overburden generally in the areas explored which included some core-drilling sites and high elevations near the haul road right-of-way. The owner knew that it had experienced difficulty in stripping overburden; it understood that the blue-gray was most difficult to excavate; and it knew that it had drilled and blasted in areas where overburden was encountered in depth, including some areas at the east

face of the old quarry. The owner failed to disclose this information to the contractor.

The court in its findings stated:

"It is the finding of the court that under the circumstances of this case, the owner's representations to the contractor and owner's conduct in conducting a tour of the site constitute a failure to disclose material information concerning extraordinary subsoil conditions of the haul road site, which information was within the knowledge and experience of the owner. Further, this failure to disclose, together with the false representations made by the owner orally and in specifications, misled the contractor concerning the nature of the material to be encountered and the conditions of excavation.

\* \* \*

"Fair dealing required that the owner disclose its knowledge of the unusual characteristics of the subsoil conditions on the island to be encountered in the excavation of the haul road under the circumstances of this case, such as the presence of snow cover and frost at the time of the contractor's inspection of the site.

\* \* \*

"His statement that the contractor 'might expect' to encounter, or the more positively worded version recalled by the contractor, constitutes misrepresentation as to existing facts in the light of the superior knowledge of the owner.

\* \* \*

"In any event, failure to give notice in writing under the circumstances of this case, does not bar the contractor's claim. The contractor verbally informed the engineer promptly after encountering the hard material that it would have to get additional compensation if it were to continue to encounter further material of this nature.

\* \* \*

"Further, where it is determined that the owner breached his duty of full disclosure and misrepresented the nature of the excavation to be encountered, its

claim for damages based on * * * failure to complete the road construction and to complete it within the time stated in the contract is directly chargeable to the owner's precedent failure to disclose available information concerning the nature of the material and to its representations which led the contractor to miscalculate the price for excavation. * * * " *Pat J Murphy, Inc v Drummond Dolomite, Inc, supra,* 520, 521, 522, 526.

We have examined the annotation on the question of the right of a public contractor to allowance for extra expense over what would have been necessary if conditions had been as represented by the plans and specifications. In 76 ALR 268, p 269, we find the following statements of interest in conjunction with this question:

"If in fact conditions are substantially different from those indicated on the plans, the question of fraud becomes immaterial, so far as compensation is concerned, if the representations as to conditions are regarded as serving to define the contractor's undertaking.

\* \* \*

"The general rule may be deduced from the decisions that where plans or specifications lead a public contractor reasonably to believe that conditions indicated therein exist, and may be relied upon in making his bid, he will be entitled to compensation for extra work or expense made necessary by conditions being other than as so represented."

At pages 270–271 of the same annotation, we find the following language from *Atlanta Construction Co v State,* 103 Misc 233, 175 NY Supp 453 (1918):

"And where plans for highway construction stated: The stone for item 40 shall be local material; the source of supply being one-half mile north of station 88 plus 00 and 133 plus 00 on the road to be improved, the Court,

in holding the contractor entitled to rely on this positive statement, said: 'We are fully aware that these contracts are so drawn as to excuse the state from almost any statement or representation which it may make in reference to matters similar to the one here involved; but we believe that there should be a limit placed on this method of leading a contractor astray to his damage and loss. There is no reason why the English language, when used by officials of the state, should not have the same meaning and significance which is attached to it when used in contracts between individuals. There was no ambiguity in any way about this statement. It was positive, direct, and peremptory.' "

Further at page 276 we find:

"Upon principle it is clear that where conditions surrounding work have been materially misrepresented, the contractor finds himself in the position of one who, having undertaken one contract, is confronted with another. Few, if any, judicial opinions deny that such is the case. The circumstance is such that if the result provided for by the written contract is to be produced, the unanticipated work must ordinarily be performed of necessity, and cannot be deemed optional as to anybody. Hence, it may be reasoned that provisions in reference to specially authorizing extra work do not meet the case, and that where the contractee has insisted upon the contractor going forward, the authority provided for in the contract, if given, would be superfluous. It is submitted that under the circumstances in question, the most that should be expected of a contractor, by way of formality, is that he seasonably make known his claim that misrepresentation has occurred, and that, if required to go forward, he will expect additional compensation."

Further annotation is found on the question of construction and effect of a "changed conditions" clause in a public works or construction contract in 85 ALR2d 211, 212, 217, to the effect that:

"where plans or specifications in a government contract lead a public contractor reasonably to believe that conditions indicated therein exist, and are relied upon in making his bid, he may be entitled to compensation for extra work or expense made necessary by the conditions having been other than presented.

"Probably inasmuch as there is a possibility of recovery by the contractor in any event, where actual conditions are materially different from those stated in the contract, and that fact could be found to have been known to an agent of the government, it has been said that Article 4 contemplates the encountering of latent conditions unknown either to the government or to the contractor at the time of the making of the contract."

In *R E Cotton Co Inc v United States,* 87 Ct Cl 563 (US, 1938), involving a contract for the construction of a levee, the evidence showed that while the work was in progress an unprecedented rainfall for the month in the particular area had materially changed the conditions attending the work, creating an emergency which justified the suspension of work by the contractor, consented to by the contracting officer, and the resumption of which, as required by the contracting officer, entailed purchasing and furnishing entirely different equipment from that contemplated by the contract, and the employment of a radically different method of work, because of the necessity of taking material from a more remote location. Extra compensation was allowed for the work done even though the contractor refused to proceed when he was not given a written change order as provided in the contract.

The trial court made a determination on a basis of "changed conditions". It held that the plaintiff had an obligation to use pit 3 when pit 4 was unavailable. Apparently no cognizance was taken of the requirement that the state had to stake and

cross-section pit 3 before it could be used by the plaintiff. Otherwise plaintiff would be in violation of the very contract which is already the subject of this extended litigation. Apparently no recognition of the fact that the state was desirous of keeping pit 3 untouched for purposes of an exchange was made by the Court in its findings. The fact of the matter is, without dispute, that pit 3 was used in such an exchange.

43 Am Jur, Public Works and Contracts, § 108, p 847, states in part:

"A contractor for public work is generally held entitled to compensation beyond that fixed by his contract * * * or made necessary * * * by reason of changes in plans and specifications, * * * and he may recover damages resulting from delays in the performance of the work, consequent upon fault of public authorities. Lack of knowledge on the contractor's part as to the conditions which have made necessary the disputed work or materials may be a factor entitling him to recover therefor."

The defendant in its brief cites 43 Am Jur, Public Works and Contracts, § 111, pp 852–853, part of which states:

"The rule is that where plans and estimates or specifications, given out by authorized public authorities as the basis for bids for public work lead an intending public contractor reasonably to believe that conditions indicated in such plans and specifications exist, and may be relied upon in making its bid, may recover on a quantum meruit compensation for extra work or expense made necessary by conditions being other than as represented therein. This rule is especially applicable where the representation as to conditions is positive, in which case the right of the contractor is not affected by general language of the contract to the effect that he is expected to investigate facts for himself."

In this case there is no dispute whatever that the state knew it did not have borrow pit number 4 nor parcels 437 and 437E for the right-of-way at the time of the signing of the contract. There was also no dispute that the estimated amounts of borrow material to come from pits 3 and 4 were necessary for the completion of the north end of the project. Further, the availability of such pits in timely fashion was essential to meeting the deadline, avoiding inclement weather, and using the multiple operation concept envisioned by the plaintiff and established as the basis of its bid by the testimony in the court below.

Further, there is no question that the plaintiff was required because of the change in the concept of the work to provide different types of machinery and to work night shifts and winter schedules and other types of activities, all of which meant increased costs to the plaintiff, without any compensation therefor if it was limited to the express payment provided for in its contract.

There was no way that the plaintiff could anticipate the fact that borrow pit number 4 was not available nor that two parcels of the right-of-way were missing. The state knew this but deliberately and wilfully withheld this information from the plaintiff until the plaintiff actually appeared on the job after the execution of the contract.

The plaintiff advances three theories in support of its claim for liability on the part of the defendants.

*A.* The state has admitted liability and has made partial payment thereon. At the time of payment in May of 1963, it merely disputed the amount of its liability and, of course, this is a damage and not a liability question.

*B.* The state failed to supply borrow pit 4, repre-

sented on the plans as being a state-supplied borrow pit. The failure was material and the contractor relied on the availability of this borrow pit in making its bid. The substitution of other borrow pits and the delay in securing same caused additional costs to the contractor. Thus, liability is established.

*C.* The contractor is entitled to additional compensation under the contract documents and more specifically, the 1957 standard specifications for road and bridge construction.[1] The plans, the bid proposal, and the standard specifications were prepared by the state and, where possible ambiguity or incompleteness exists, should be construed strictly against the state. The specification provisions pertinent to liability here are:

1.) Specifications 1.05.03 and 1.04.04. The failure to supply borrow pit 4 and the substitution of other borrow pits was a deviation from the plans for the work, requiring the written order of the engineer. The deviation from the plans resulted in commissioner-ordered extra work not included or contemplated by the bid proposal or the contract. This imposed the burden upon the engineer under specification 1.04.04 to furnish a proposal to the contractor for a new unit price or lump-sum bid on the additional work. Authorization number 3003[2] constitutes the written order of the engineer (or his practical equivalent) for the deviation. No proposal for a new unit price or a lump-sum bid on the additional work was ever submitted. Under the circumstances it was impossible or at least impracticable to proceed on other than a force-account basis. Subsequent conduct of the parties confirms

[1] See joint exhibit 1F.
[2] See joint exhibit 17.

this approach. The work was ordered, performed, and accepted, and liability must follow.

2.) Specification 1.05.02. If the additional work or change caused by the elimination of borrow pit number 4 does not come under number 1 above, it must fall within paragraph 1.05.02 of the specifications as to work or materials not clearly covered in the contract or resulting from changed conditions. Any notice requirements of this paragraph were either met or waived and, after performance and acceptance of the work, the liability of the state follows.

*D.* The failure of the state to supply borrow pit 4, and its delay in securing any substitutions therefor, hindered, frustrated, and delayed the contractor in completing the rough grading in a material fashion and caused additional expense to it. Said failure caused the unilateral change in the contract and in the character and timing of the work to be performed at the north end of the project. The state received the benefit of this work and has the implied obligation to pay the reasonable value thereof, including a profit to the contractor.

From our examination of the contract, the exhibits and the record in the court below and a careful reading of the briefs, both at trial and on appeal, and the various authorities cited therein, we are constrained to the conclusion that there was proof by a preponderance of the evidence that plaintiff's position was sustained on all theories with the possible exception of theory A, but was strongest under theories C(1) and D. The failure of the state to disclose its lack of borrow pit 4 and the subsequent developments created an entirely new contract nowhere within the concept of the parties at the time that the written instrument

between them was executed. There was a clear breach of the contract on the part of the state highway department. All of the damages flowing from such breach were the natural and proximate consequence of the breach complained of. "[T]he law in Michigan has for many years provided that in order for damages to be recoverable in contract actions it must be shown that damages are the natural and proximate consequences of the breach complained of." *Sattler v Fisher Contracting Co,* 30 Mich App 617, 622 (1971).

Thus we are forced to the inevitable conclusion that the preponderance of the evidence in the court below is in favor of a finding of liability on the part of the state. The extent of such damages and the question of the obligation to mitigate and steps taken by plaintiff in mitigation of damages are not questions before this Court in light of the stipulation between the parties, concurred in by the trial court, to the effect that liability would be tried as a separate issue and if liability was found then the question of damages would be tried separately.

We now proceed to the question of the trial court's disposition of counterclaim I filed by the state against the plaintiff and the plaintiff's appeal therefrom. Counterclaim I was based on two payments made by the state to the plaintiff:

1. *Down time of equipment from February 23, 1961 through March 9, 1971: $60,160.93.* [3]

2. *Extra expense incurred from changing to borrow pits 8 and 11: $60,866.* [4]

The trial court found against the plaintiff and in favor of the defendant on counterclaim I. The

[3] See joint exhibit 33.

[4] See joint exhibit 34.

court based its findings on its conclusion that the equipment down time resulted when the haul road out of pit 3A became impassable due to an early thaw. Further, the court found that recourse to pits 8 and 11 was made necessary when pit 3A became unavailable due to its haul road becoming impassable. All three of these borrow pits on which the court relied for its conclusion were not within the state's possession at the time the contract between the parties was entered into. Consequently, they could not be within the contemplation of the parties when they entered into their contract. Furthermore, these all had to be acquired because the state failed to acquire pit number 4 and found it necessary to release pit number 3 in order to secure two parcels of right-of-way which they did not own at the time of the contract and with those parcels, pit 3A. All of these things stem from the state's failure to disclose the fact that it did not have pit 4 nor parcels 437 and 437E of the right-of-way. Coupled with its failure to disclose such information was the fact that they made an affirmative representation in the bid proposal that the defendant in fact had such borrow pit and right-of-way parcels.

This issue can best be resolved by posing this question in the following manner:

> *Whether, absent a finding of fraud and lack of authority in the State Highway Commissioner who authorized payment, the state can recover monies paid under a highway construction contract for extra work?*

Highway officials under MCLA 250.62; MSA 9.902 had the authority to make payments for extra work at the time such payments were made for the items constituting counterclaim I as set forth hereinabove.

The trial court found it unnecessary to decide whether, once payment has been authorized by state officials and payment made pursuant thereto, the state later can recover the sum so paid. This conclusion was based on the court's finding that the highway department's payments had not irrevocably committed the state insofar as the claims remained open under the contract. The court then went on to further find:

"The proofs as to this counterclaim are found in the record made in connection with plaintiff's claim and the defense thereto, and I am of the opinion that the state has satisfied the burden of proof as to it.

"The equipment downtime resulted when the haul road out of pit 3A became impassable due to an early thaw.

"Recourse to pits 8 and 11 was made necessary when pit 3A became unavailable due to its haul road becoming impassable.

" * * * I further conclude that it was [plaintiff's] miscalculation as to the quantities of earth to be obtained from pit 4, and its reliance on this miscalculation, which led to its initial and continuing decision not to use pit 3, which in turn was responsible for abandonment of pit 3 and resort to pit 3A with the delay attendant upon securing pit 3A. [Plaintiff] must therefore assume responsibility for any expense resulting from pit 3A becoming unavailable in February and March of 1961, and should not have been compensated for them as extras."

The trial court based the state's right to recover payments for extra work made in connection with borrow pit 4 delays on the *fact* that extra expenses in this area constituted an account left open on plaintiff's option to contest the damages. The court found it unnecessary to determine whether, payment once having been made by the state, it was barred from recovering a subsequently alleged

overpayment, because, in fact, the payment had never become final. And, contrary to defendants' position, the trial court did not go so far as to say no extra work had been done by plaintiff for the payment received. Rather, the court implied the extra work was the result of plaintiff's failure to mitigate the expensive delay by recourse to pit 3.

*Gogebic National Bank v Ironwood Twp,* 239 Mich 369 (1927), governs the present case. The circumstances in *Gogebic* are similar to those herein. The Fitzpatrick brothers contracted with the Township of Ironwood, in Gogebic County, to construct 1-1/2 miles of road in strict conformity with plans and specifications prepared by the county highway engineer. A fixed price for earth and rock excavation, for gravel surface, for concrete, and for loose rock was agreed upon. The Fitzpatrick brothers made claims for extra work relating to loose rock after the completion of the project. Having already issued a $6,000 payment order on the project, the township board and highway commissioner met with the contractors and awarded a payment order for $7,657 in final settlement. These orders were discounted to a local bank for collection. When presented for payment, the Township refused to honor the orders on the basis they made allowance for loose gravel to which the contractors were not entitled. On review, the Supreme Court affirmed the trial court's directed verdict for the bank, making the following observations:

"When the contract was completed and a settlement was attempted, the allowance for loose rock became the bone of contention. The contractors made claim for the removal of a specific number of cubic yards thereof. The board advised with the county engineer and with a competent road builder, a member of the board, who

had under its employment acted as an inspector during a part of the time, and finally agreed with the contractors to issue them an order for $7,657 in full settlement of their claim. This was less than they claimed, but they accepted it and the order was issued and delivered to them.

"The question presented was not a legal one. If now submitted to a jury, it would be its duty to determine how many cubic yards of loose rock were removed.

"No claim is made that the members of the board were in any way unduly influenced in reaching this settlement. They were apparently men of probity and honor, and acted in what they believed to be the best interests of their township. No fraud is charged, and certainly none is proven. Nor can it be claimed that the order was issued under a mistake of fact. A settlement thus made cannot afterwards be attacked. In *Advertiser and Tribune Co v City of Detroit,* 43 Mich 116, 119 [1880], it was said:

" 'Where power is given to the common council of a city to audit and allow all accounts chargeable against it, the law presumes that they will investigate all claims presented, and it is clearly their duty so to do. They cannot formally allow claims without any investigation or effort to investigate, and afterwards order an investigation and rescind their action and recover back moneys paid, because of facts existing but not known at the time the account was allowed, and which a proper examination would then have brought to their attention. Such a doctrine would be productive of endless mischief and litigation.'

"See, also, *Township of Churchill v Township of Cummings,* 51 Mich 446 [1883]; *Feily v Campground Association,* 210 Mich 197 [1920]; *Town of Dekorra v Wisconsin River Power Co,* 188 Wisc 501 (205 NW 423) [1925]; 2 Dillon on Municipal Corporations (5th ed), §§ 821, 822." *Gogebic National Bank v Ironwood Twp, supra,* 372–373.

Applying the test of fraud and mistake appearing in *Gogebic* to the present case, it is clear, as plaintiff contends that fraud was neither charged

nor proven. The trial court did find from its own particular vantage that the plaintiff's own miscalculations led to its failure to skirt the avoidable consequences of delay in connection with the missing borrow pit number 4. The trial court did not find, however, that highway officials had made a specific mistake of fact in granting payment for extra work in connection with borrow pit 4. Indeed, the court earlier found, or seemed to find, that the state's payment for amounts claimed above the contract was an admission of liability. Nothing stated by the trial court overcomes the presumption that payments by authorized government officials are correct as applied to the challenged payments to Holloway.

The trial court merely expanded its earlier finding that plaintiff did not do all that it might have to offset the loss of borrow pit 4 made in connection with its claims beyond the settlement award already made by the state. We expressly emphasize here that we do not by this language give sanction to nor affirm the findings of the trial court on the question of mitigation of damages by the plaintiff with respect to losses arising from the state's failure to provide borrow pit 4. This is a question that is exclusively for the second hearing to be held on the question of damages pursuant to the stipulation of the parties, concurred in by the trial court and now necessary in light of our findings on the question of liability.

The trial court based that conclusion on its finding that the contract relations between the parties had not come to rest because of the plaintiff's decision to further litigate its claims. It does not require a reopening of matters already settled. The state's earlier payment established the lower limits of the plaintiff's recovery, while the current

suit sought to establish the upper limit. The trial court sought to alter what had already been settled between the parties without disclosing the particular error in the administrative decision of the highway department to grant the added payment or the approval of the State Administrative Board as to such payment. Without pointing out any specific error the trial court substituted its opinion for the judgment of the highway department officials and the State Administrative Board. The trial court may well have believed the damages could have been mitigated had plaintiff resorted to borrow pit number 3 when pit 4 failed to materialize. This opinion, however, is in no way conclusive against the prior determination of the highway department.

When parties to a contract have given a practical interpretation to the provisions of that contract, such an interpretation is entitled to consideration by the Court. *Davis v Kramer Brothers Freight Lines, Inc,* 361 Mich 371 (1960).

"Admissions are statements made by or on behalf of a party to the suit in which they are offered which contradict some position assumed by that party in that suit. They are substantive evidence for the adverse party, but never for the party by whom or on whose behalf they are supposed to have been made." *Elliotte v Lavier,* 299 Mich 353, 357 (1941).

An admission is not conclusive of the facts stated therein and admissions may be varied or contradicted by other evidence. *Guarantee Bond & Mortgage Co v Hilding,* 246 Mich 334 (1929). The converse is also true. An admission is conclusive unless it is varied or contradicted by other evidence. In other words, an admission of liability which is not satisfactorily explained or contradicted during the trial is persuasive evidence to

support the position of the other party suing thereon in accord with such admission or statement. *Conroy v Harrison,* 368 Mich 310 (1962).

The joint exhibits indicate clear admissions by highway department officials. The testimony of Howard Hill and John Mackie contain identical admissions. It is apparent that the admissions by Messrs. Mackie, Hill, Lundberg, and MacCreery were not varied or contradicted by other evidence since the evidence in this case dealt only with the performance of the contractor, whereas the testimony of the named officials of the highway department dealt with the analysis of that performance as it relates to standard specifications and the question of additional compensation. We find in 5 Corbin, Contracts, § 1001, pp 29–31:

"A plaintiff who has proved the breach of a contractual duty by the defendant is always entitled to a judgment for damages therefor, except in cases where the contract is made unenforceable in this fashion by some statutory provision. For this purpose it is not necessary for the plaintiff to prove the amount of harm that he has suffered by reason of the defendant's breach of duty. If he makes no such proof, however, the judgment in his favor will be for nominal damages only. Such damages are a small sum of money fixed, without regard to the extent of the harm done, by the custom of the jurisdiction in which the action is brought. Of course, in any case where the plaintiff can and does get judgment for compensatory damages, his right to nominal damages as a sum separate from the compensatory damages does not exist. A plaintiff who gets judgment for nominal damages is frequently given judgment for costs of the action also; but this is not necessarily the case. Costs are largely in the discretion of the court; and, in some jurisdictions, costs will not be adjudged to the plaintiff unless he proved some substantial harm done." (Footnotes omitted.)

Next in § 1002, p 35, Compensatory Damages,

Corbin discusses the difficulty in balancing plaintiff has against the foreseeability of injury by defendant's breach and concludes by saying:

"The rules for determining the damages recoverable for breach are not rules of interpretation of contract. Interpretation is the process of giving meaning to the expressions of the parties for the purpose of determining what the promised performance was; until interpretation is complete, there is no opportunity for applying the rules as to measure of damages."

The highway department acknowledged their partial breach in failing to provide borrow pit 4 and by practical application of the facts of the contract, assigned the amount of $121,026.93 as liquidated compensation for the breach. Since it would appear that plaintiff was entitled at the very least to nominal damages, and in view of the difficulty entailed in reaching a judicial determination of the damages, it would seem that the practical values set on the breach by defendants was not unreasonable and should have been allowed to stand.

We have every reason to believe that the members of the administrative board in approving the recommendation of the highway department on these payments acted with probity, great care, and diligence, and being gentlemen of probity they conducted themselves accordingly in their action upon such request by the highway department for extra payment to the contractor at the time of the request.

We now come to that important issue of the cross appeal on the denial of counterclaims II thru VII.

Counterclaim II was for return of $106,099.00 which plaintiff had received for the upgrading of

aggregate base course material because of weathering through freezing and thawing during the fall and winter of 1960–1961 which caused a breakdown of encrusted material and shale to a point where loss by washing exceeded the 8% allowable under the specifications for the project.

Counterclaim III. Plaintiff was paid the sum of $42,153.72 because of an increase in haul distance resulting from a request by Berrien County to avoid use of Napier Avenue between M-140 and I-94 because of its poor condition. This payment was based on the extra haul distance in accordance with Michigan Public Service Commission common-carrier rates. Refund here was claimed on the basis that a specific provision of the contract required the contractor to restore any county roads, damaged by its operations or by its operations in hauling borrow or other construction material, to the original condition.

Counterclaim IV. Payment in the amount of $13,324.59 was made to the Berrien County road commission and the City of Bridgman for restoring haul routes damaged by plaintiff in hauling materials to the job site. The state claims that such cost of restoring roads was an obligation assumed by the plaintiff under the terms of this contract.

Counterclaim V. Plaintiff was paid additional compensation of $10,506.66 for removal of 3 to 9 feet of muck found under the existing shoulders on existing US-12 directly under proposed widening. The muck was not shown on the plans and it was necessary to remove the same under heavy summer traffic which involved frequent stopping of equipment. Operations were further hampered here by overhead power lines and telephone lines. Defendant claims that such muck removal, although not shown in the plans, was covered by

specification 2.08.01 of the contract between the parties under the term "earth-excavation". Defendant contends that since earth excavation was agreed upon at a unit price of $.29 per cubic yard and plaintiff received $.85 per cubic yard, plaintiff should be required to refund the difference. The specifications only provided for two types of excavation: rock excavation and earth excavation. No provision was made for any unit price as to muck removal for the apparently simple reason that there was no indication anywhere in the proposal that muck was to be removed or that its encounter was anticipated.

Counterclaim VI. Specification 3.01.01 describes placement and compacting of aggregate base course if damage to the subbase occurred in the course of construction. The state contends that under the provisions of the contract, plaintiff should have restored the subbase to that required by the specifications. Plaintiff was paid the sum of $19,475.88 to repair damages to the subbase and, the state claims, should now be required to reimburse such sum.

Counterclaim VII. Plaintiff was paid the additional sum of $3,149.20 to furnish a flagman to maintain traffic control. The state claims this control was necessitated by the failure to complete the project and open the road to traffic at the agreed-upon time. Completion of contract and open-to-traffic dates were identical in the contract between the parties. The state claims if plaintiff had performed in accordance with the contract, no traffic control would have been required while seal coat was being applied. Consequently, they claim it is the plaintiff's obligation to pay for such flagman.

The following language is contained in the contract documents:

"The undersigned [plaintiff] further proposes to do such extra work as may be authorized by the commissioner, prices for which are not included in the itemized bid. Compensation shall be made on the basis agreed upon before such extra work is begun."

The contract also provides:

"Said party of the first part [Highway Commissioner] further agrees to pay the said party of the second part [plaintiff] for such extra work as may be ordered by the party of the first part or his authorized representative, prices for which are not included in the above items, the price or on the basis agreed upon before the extra work is begun."

Further, the contract provides:

"Authorization and payments for unforeseen contingency shall be as provided by that resolution of the state administrative board adopted and appearing in said board's minutes of July 17, 1956."

Standard specifications which are part of the contract documents recognize and codify the fact that compensation will be paid for extra work and that decisions with respect thereto will be made by the commissioner. (Specifications 1.0, 4.04 and 1.05.12.) Questions as to interpretation of the plans and specifications are to be decided by the chief engineer or his authorized representative under specifications 1.0, 1.04, and 1.05.01. It is elementary that the authority to order and pay for extras, conceded by all parties to this litigation, coupled with the authority to decide questions of interpretation of the plans and specifications, necessarily includes the authority to decide what is extra work.

The state highway commission act, MCLA 250.62, MSA 9.902 then provided:

"The state highway commissioner is hereby autho-

rized to contract with boards of county road commissioners, township boards, or with any other person, persons, firm or corporation for the construction, improvement and maintenance of trunk line highways, or he may do such work on state account. The state highway commissioner, subject to the approval of the state administrative board, is hereby authorized, empowered and directed to do all acts or things necessary to carry out the purpose of this act."

Each of the items covered under these counterclaims, carried a label at the top: "Extras to Plans" except in two cases which were labeled: "Changes in Plans". Each of the authorizations contained an explanation of why the item was considered an extra by the engineering and administrative officials involved. On several occasions during the trial below, the Attorney General conceded the complete good faith of the state officials who approved the several authorizations and claims as extras.

There were no proofs presented to sustain the burden of proof on these counterclaims. In fact, on several occasions a statement was made on the record that the state would offer no testimony but would rely exclusively on the several authorizations involved and the plaintiff's stipulation that it had received the monies indicated by such authorizations. There was no showing that the contract between plaintiff and the defendants was *ultra vires* or invalid in any respect, or that the state officials who acted did not have authority to order and pay for such extra changes in plans. There was no evidence presented that all of the claims were not fully investigated, audited, allowed, and paid as *extras* with the full approval of the required highway department and State Administrative Board officials, including the Attorney General. There was no showing of fraud, collusion, or

misrepresentation on the part of either the state officials or the plaintiff. For these reasons we were somewhat taken aback when, at oral argument on this appeal, representatives of the Attorney General seemed to question the propriety of the actions of the highway department officials and the State Administrative Board which includes the Attorney General. The plaintiff did offer some evidence on each of the counterclaims to support the determination that the payments were, in fact, for extras. Where the parties to a contract have by their conduct given a practical interpretation to the provisions in question, such interpretation is entitled to consideration by the Court. *W O Barnes Co, Inc v Folsinski,* 337 Mich 370 (1953).

Examination of the contract and the several exhibits offered with respect to the counterclaims enumerated hereinabove, coupled with the testimony offered by the highway officials called as witnesses on the part of the plaintiff, leads us to the conclusion that there were sections of the contract which placed the responsibilities on parties other than the contractor for many of the items which were performed by the contractor and which the state now seeks to recover by way of counterclaim. We agree with the trial judge that the proofs, both oral and documentary, fail to enable the defendants to sustain their burden of proof with respect to these counterclaims. They should be denied as they were by the trial court.

Accordingly, we affirm the trial court on its disposition of counterclaims II through VII. We reverse as to counterclaim I and we reverse as to the question of liability on the part of the defendants under the plaintiff's complaint and remand to the Court of Claims for the taking of proofs on the question of damages.

All concurred.